## EARL PRYOR AND S. BERNICE PRYOR *v.*
## COMMISSION

Earl Pryor appeared *in propria persona.*

G. F. Bartz, Assistant Attorney General, Salem, Oregon, represented the defendant.

Decision for plaintiffs rendered June 12, 1969.

EDWARD H. HOWELL, Judge.

The sole issue presented in this appeal is the valuation of certain farmland owned by the plaintiffs in Gilliam County for the tax year 1967-68.

The property consists of approximately 2,000 acres of wheatland. In plaintiffs' appeal to the board of equalization and the State Tax Commission an additional 900 acres of grazing land was involved but plaintiffs have withdrawn the issue of the value of that grazing land in their appeal to this court.

The assessor valued plaintiffs' property at $247,220 as of January 1, 1967, and this valuation was confirmed by the board of equalization and the State Tax Commission. The plaintiffs allege in their complaint that the land should be valued at $231,405.

While the difference in the value found by the assessor and the value claimed by the plaintiffs is not

substantial, the primary disagreement of the plaintiffs is with the assessor's classification of their land. They are not disputing the values assigned by the assessor to the various classifications of the land but only to the classifications themselves. Indirectly, of course, the values are involved in finding true cash value of the whole property because values are assigned to the various classifications.

In 1962 a reappraisal of Gilliam County was initiated under the supervision of the tax commission. The county was divided into five zones which were generally established on the basis of rainfall, soil and estimated crop yields. The tillable land was divided into classes ranging from Class I to Class V with some plus and minus classifications and some classifications for crested wheat. Primarily the classifications were determined on the basis of yield per acre and depth of soil. As an example, Class III land in Zone I required a soil depth of 24 to 30 inches to yield from 28 to 32 bushels per acre. Class III+ land in Zone I required a depth of 30 to 38 inches to yield 33 to 37 bushels per acre. The depth of the soil was determined by making soil core borings in various places on the land. In addition to the soil measurements, consideration was also given to the moisture holding capacity of the soil, the direction and degree of slope of the land and alkaline and clay characteristics of the soil in determining the classifications.

The reappraisal of the county continued without interruption until the disastrous floods of December, 1964, and January, 1965. In the spring of 1965 a review of the effect of the floods was made in Gilliam County and it was determined that a topsoil loss had resulted. However, no reclassification was made except in areas where the farmland was completely de-

stroyed or where the damage was so extensive it resulted in a change of use of the land from cropland to grazing.

The land classification was completed in 1965 and the values placed on the assessment roll as of January 1, 1966.

The plaintiffs contend that the floods damaged the topsoil on their land to the extent that the land classifications based on depth of the soil before the flood were no longer applicable and portions of their land should have had a lower classification as of January 1, 1967.

An employee of the Soil Conservation Service testified that the floods were particularly severe in the Condon area where plantiffs' land is located. He also testified that the average loss of topsoil on seeded farmland would approximate 60 tons per acre, and the loss in portions of some fields would range from 150 to 280 tons per acre, depending on the type of soil. A depth of 20 inches is considered marginal for farming.

In May, 1967, the plaintiffs retained the United States Testing Service, a soil testing firm in Richland, Washington, to conduct a soil test and land classification analysis of their land. Over 1,800 soil core borings were made on plaintiffs' property. The assessor's land classifications and the soil depth for each classification were used by the testing company.

Using the results obtained from the soil testing service the plaintiffs prepared an analysis showing the changes in the various soil depths which plaintiffs contend should result in lower classification of portions of their land. For example, land formerly classified as III+ land with a soil depth of 30 to 38 inches was partially reclassified, resulting in a reduction of

the III+ acreage and an increase in acreage in the III classification.

While the report of the county appraiser who participated in the original reappraisal admits that a topsoil loss occurred, no soil core borings were conducted on plaintiffs' land subsequent to the floods and before the trial to determine the extent of the loss. Nor was any attempt made to determine whether or not such loss of topsoil would require a reclassification. The appraiser's report stated that no allowance was made nor authority given to him to reclassify the land.

The evidence supports the plaintiffs' contention that the 1964 and 1965 floods caused a topsoil loss and a portion of plaintiffs' land should be reclassified.

The following adjustments in land classification and values should be made on plaintiffs' lands:

| Crop Acres | Land Class | Value Per Acre | Land Valuation Change | |
|---|---|---|---|---|
| | | | Plus | Minus |
| — 12 | II | $200 | | $ 2,400 |
| — 113 | III+ | 150 | | 16,950 |
| + 114 | III | 125 | $14,250 | |
| — 98 | III— | 100 | | 9,800 |
| — 48 | IV | 80 | | 3,840 |
| + 5 | IV— | 65 | 325 | |
| + 67 | V | 50 | 3,350 | |
| — 12 | III—CW | 95 | | 1,140 |
| + 30 | VI CW | 32 | 972 | |
| | | | $18,897 | $34,130– |
| | | | | 18,897 |
| Total net decrease in valuation | | | | $15,233 |

The plaintiffs' farmland should be valued at $231,987 as of January 1, 1967.